[No. 6464. Decided December 8, 1906.]

O. P. Burrows *et al., Respondents,* v. Grays Harbor Boom
Company and The Humptulips Driving
Company, *Appellants.*[1]

Navigable Waters—Obstruction—Riparian Rights—Logs and Logging—Boom Companies. The right of riparian owners to the unobstructed navigation and use of the waters of a meandered navigable stream is not in any way affected by the statutory provisions (Laws 1889-90, p. 470, § 1) authorizing the incorporation of boom companies and conferring power on such companies to acquire and use real and personal property necessary for carrying on the business of booming logs, by the right of eminent domain.

Same—Statutes—Construction. The act of 1895, p. 128, § 4, wherein it is provided that nothing therein shall be construed to authorize a boom company to injure or damage any property, shows the legislative intent that such companies, whether incorporated before or after the act, should have no exclusive right of navigation or authority to obstruct the stream; since the same was, in part, an act to enlarge the power of boom companies theretofore incorporated.

Same—Eminent Domain. The legislature has no power to confer authority upon a boom company to overflow the land of riparian proprietors or to make any use of or injure the land above the line of ordinary high water, or encroach upon the banks of a navigable river, as the same would be a taking or damaging of property without first making compensation therefor, in violation of Const., art. 1, § 16.

Same. There is no distinction as to the rights of riparian owners to injunction between meandered and nonmeandered streams, as far as the right of boom companies to float logs is concerned.

Same—Right of Boom Company to Obstruct Stream—Negligence. The reasonable care of a boom company in its operations of floating and booming logs does not justify an obstruction of navigation and injury to the lands of a riparian owner, where there is actual invasion of constitutional rights and a permanent taking, use and damaging, by the overflowing of, and lodging of logs, on the land, and the use of the bank as one side of the company's boom, and permanent obstruction of the waterway.

[1]Reported in 87 Pac. 937.

NAVIGABLE   WATERS — RIPARIAN   RIGHTS — STATUTES — DAMNUM
ABSQUE INJURIA.  The statute authorizing the incorporation of boom
companies expressly guarantees the rights of riparian owners when
it provides that a boom company shall not interfere with navigation
or injure or damage adjacent lands; and in such case there can be
no application of the doctrine of *damnum absque injuria.*

INJUNCTIONS—DECREE AGAINST OBSTRUCTION OF STREAM AND DAM-
AGE TO RIPARIAN RIGHTS—CONSTRUCTION.  A permanent injunction
against the obstruction of navigation in front of the plaintiffs' prem-
ises, is to be construed with reference to the plaintiffs' rights only;
and a decree is not objectionable as too broad or practically pre-
venting the doing of business by a boom company, where it enjoins
the defendant from obstructing navigation in front of the plaintiffs'
lands, from sorting or holding logs against or using the banks of
said premises, from operating any boom so as to prevent plaintiffs'
use or navigation of the river, or to cause the overflowing of the
lands, from causing artificial floods overflowing the lands, and from
using plaintiffs' premises as one side of its boom, and requiring it to
keep open a waterway 50 feet wide next to said lands.

SAME—LOGS AND LOGGING.  The statute providing that boom com-
panies shall not interfere with navigation does not require a free
passage on both sides of the boom for all boats, inasmuch as the
company is given power to condemn lands and rights necessary to
operate its business.

Appeal from a judgment of the superior court for Che-
halis county, Chapman, J., entered May 19, 1906, upon find-
ings in favor of the plaintiffs, after a trial on the merits be-
fore the court without a jury, enjoining the obstruction of
a navigable stream and the interference of plaintiffs' rights
as riparian owners thereon.   Affirmed.

*J. B. Bridges* and *Ben Sheeks,* for appellants, contended,
*inter alia,* that riparian owners have no special or peculiar
rights below the line of ordinary high tide by reason of their
ownership of the uplands; not even a right of access.  *Shively
v. Bowlby,* 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331;
*Eisenbach v. Hatfield,* 2 Wash. 236, 26 Pac. 539, 12 L. R. A.
632; *Board of Harbor Line Com'rs v. State,* 2 Wash. 530,
27 Pac. 550; *Tomlin v. Dubuque etc. R. Co.,* 32 Iowa 106,
7 Am. Rep. 176; *Lansing v. Smith,* 4 Wend. 9; *Gould v. Hud-*

*son River R. Co.*, 6 N. Y. 522; *Sultan Water & Power Co. v.
Weyerhauser Timber Co.*, 31 Wash. 558, 72 Pac. 114; *Hutton
v. Webb*, 59 L. R. A. 33, and note; 4 Am. & Enɢ. Ency.
Law (2d ed.), 709. Private rights when recognized must
yield to the superior public right of navigation—the floating
and booming of logs. *Cohn v. Wausau Boom Co.*, 47 Wis.
314, 2 N. W. 546; *Keator Lumber Co. v. St. Croix Boom Co.*,
72 Wis. 62, 38 N. W. 529, 7 Am. St. 837; *Scranton v.
Wheeler*, 179 U. S. 141, 21 Sup. Ct. 48, 45 L. Ed. 126. A
state has the absolute right to control navigation upon a
navigable stream until such time as the United States gov-
ernment shall exercise its control over the stream. It has the
right to permit the stream to be either partially or entirely
obstructed against ordinary boat navigation. *Hutton v. Webb*,
*supra;* 4 Am. & Eng. Ency. Law (2d ed.), 709; 21 Id. 432;
*Green & Barren River Nav. Co. v. Chesapeake etc. R. Co.*, 88
Ky. 1, 10 S. W. 6, 2 L. R. A. 540; *Stevens v. Paterson etc.
R. Co.*, 3 Am. Rep. 269; *Georgetown v. Alexandria Canal Co.*,
37 U. S. 91, 9 L. Ed. 1012; *Gilman v. Philadelphia*, 70 U. S.
713, 18 L. Ed. 96; *Pound v. Turck*, 95 U. S. 459, 24 L. Ed.
525; *Bailey v. Railway Co.*, 44 A. D. 593; *Tomlin v. Dubuque
etc. R. Co.*, *supra; Scranton v. Wheeler*, 179 U. S. 141, 45
L. Ed. 126; *Black River Imp. Co. v. La Crosse Boom etc.
Co.*, 54 Wis. 659, 11 N. W. 443, 41 Am. Rep. 66; *Wisconsin
River Imp. Co. v. Manson*, 43 Wis. 255; *Keator Lum. Co. v.
St. Croix Boom Co.*, 72 Wis. 62, 38 N. W. 529; *Huse v.
Glover*, 119 U. S. 543, 7 Sup. Ct. 313, 30 L. Ed. 487; *Sands
v. Manistee River Imp. Co.*, 123 U. S. 288, 8 Sup. Ct. 113,
31 L. Ed. 149. If individuals are, in consequence thereof,
incidentally injured, such loss is *damnum absque injuria.
Bailey v. Railway Co.*, and *Stevens v. Patterson*, *supra.* The
stream is a navigable stream within the laws and constitution
of the United States. *United States v. Wishkah Boom Co.*,
136 Fed. 42; *United States v. Bellingham Bay Boom Co.*,
176 U. S. 211, 20 Sup. Ct. 343, 44 L. Ed. 437. The whole

question of the blocking of the stream above the boom must
be resolved down to a matter of negligence or want of negli-
gence upon the part of the boom company. Bal. Code, § 4380;
*Watts v. Tittabawassee Boom Co.*, 52 Mich. 203, 17 N. W.
809; *Davis v. Winslow*, 51 Me. 264, 81 Am. Dec. 573; *Swan-
son v. Mississippi etc. Boom Co.*, 42 Minn. 5, 44 N. W. 986;
*Page v. Mille Lacs Lum. Co.*, 53 Min. 492, 55 N. W. 608,
1119; *Hunter v. Grande Ronde Lumber Co.*, 39 Ore. 448, 65
Pac. 598; *Coyne v. Mississippi etc. Boom Co.*, 72 Minn. 533,
75 N. W. 748, 41 L. R. A. 494; *Small v. Harrington*, 10
Idaho 499, 79 Pac. 461; *Field v. Apple River Log-Driving
Co.*, 67 Wis. 569, 31 N. W. 17; *Hopkins v. Butte etc. Com-
mercial Co.*, 13 Mont. 223, 33 Pac. 817, 40 Am. St. 438;
*Bauman v. Pere Marquette Boom Co.*, 66 Mich. 544, 33 N. W.
538; *Mitchell v. Lea Lumber Co.*, 43 Wash. 195, 86 Pac. 405.
Damages caused by the logs or by artificial freshets were the
necessary result of the operation of the boom, and for which
there can be no recovery unless there was negligence. *Mitchell
v. Lea Lumber Co.*, *supra; Falls Mfg. Co. v. Oconto River
Imp. Co.*, 87 Wis. 134, 58 N. W. 257; *Black River Imp. Co.
v. La Crosse Boom etc. Co.*, *supra; Sands v. Manistee River
Imp Co. supra; Willamette Iron Bridge Co. v. Hatch*, 125
U. S. 1, 8 Sup. Ct. 811, 31 L. Ed. 629; *A. C. Conn Co. v.
Little Suamico Lum. etc. Co.*, 74 Wis. 652, 43 N. W. 660;
*Field v. Apple River Log-Driving Co.*, *supra.*

*J. W. Robinson (Bogle, Hardin & Spooner*, of counsel),
for respondents.

DUNBAR, J.—This was a suit to enjoin the appellants from
interfering with alleged rights of respondents as riparian
owners and otherwise. The complaint is so long that space
and time will permit presenting but a short summary of it.
It alleged, that the plaintiffs were the owners of certain lands
bordering upon the Humptulips river, in Chehalis county,
Washington; that the river was about two hundred and fifty

feet in width, navigable for the floatage of sawlogs and other timber products and for small boats; that the waters of the river opposite plaintiffs' premises were suitable for domestic purposes; that plaintiffs had built a home on the west bank of the river, and were residing there; that the river furnished them the most convenient public highway; that the defendants were corporations, under the laws of the state of Washington, and had constructed boom works in the river immediately below the premises of the plaintiffs; that by reason of such construction, the river, at and opposite plaintiffs' premises, was, for a great portion of the time, completely filled with sawlogs, thus depriving plaintiffs of their right to navigate said river, and to cross the same and to go down the same to the waters of Grays Harbor; that defendants used the west bank of the river where plaintiffs' lands were located as the west wall of their boom, and the large number of logs accumulating in the river at and near plaintiffs' premises caused the water of the river to dam up and overflow plaintiffs' lands and endanger their home, and to prevent the use of the water for domestic purposes; that the maintenance and operation of the boom caused the banks of plaintiffs' land to be washed away; that such injury was continuous, and that the defendants used the said river, both opposite and below the plaintiffs' premises, for the storage of logs. Other allegations in relation to future damage which would be incurred in the operation of the boom and driving companies appear in the complaint. The facts found by the court, and which from an investigation of the testimony we will accept as the facts in the case, will more concisely divulge the allegations of the complaint, as they are based upon such allegations.

The answer denies practically all the complaint, or that portion of it which alleged that damage was being done to the plaintiffs by reason of the operation of the booms; and further alleged that the defendants were corporations, duly organized and existing by virtue of the laws of the state of

Washington in relation to boom companies; and that whatever they had done, they had the permission of the state of Washington and the United States government to do.   And it may be said here that this is the pivotal question in the case —whether they had the permission of the state of Washington and of the United States government to do the things which it was found by the court they had done.

The court found, in substance, that the Grays Harbor Boom Company and the Humptulips Driving Company, defendants, were both corporations, organized and existing under the laws of the state of Washington, each having its principal office and place of business at Aberdeen, Washington, and that C. D. Burrows and A. P. Stockwell were at all the dates mentioned in the complaint, and were at the time of the trial, the only stockholders and officers of each of said corporations [Under this finding, the correctness of which is not disputed, we will not find it necessary to enter into a discussion of the different responsibilities of these two alleged different corporations] ; found that the plaintiffs were the owners of certain land adjoining the Humptulips river at the place alleged in the complaint; that the Humptulips river was a government meandered fresh-water stream, emptying into the waters of Grays Harbor; that it was navigable in its natural condition for small craft, and was floatable for many miles inland, and through the plaintiffs' lands; that the average width of the river from the mouth to the north line of plaintiffs' lands was about two hundred and fifty feet; that the water therein for that distance was of a depth of from ten to. fifteen feet, mean high water, and from four to five feet, low water; that the water was suitable for domestic and livestock purposes in front of plaintiffs' premises, and was used by them for domestic and livestock purposes, from the date of their residence upon said premises until the acts of the defendants prevented them from so using them; that the water in said river in front of plaintiffs' premises was suit-

able for domestic and livestock purposes during the whole of
the year, excepting during the months of July and August,
when it was slightly brakish; that the plaintiffs purchased
these lands in the year —— and thereafter erected on the west
bank of said river on said premises a dwelling, consisting of
ten rooms, being a two-story frame building, and a barn, with
the usual outhouses for wood, hogs, cattle, chickens, etc., and
had cleared and put in cultivation about —— acres of land
in the vicinity of the house adjoining said river, and removed
to such premises with their family, consisting of plaintiffs
and their children, two boys and two girls, being from the
age of two and one-half to eighteen years; that they put out
fruit trees and constructed fences upon said premises, and
have kept, and did keep at the time of the trial, livestock con-
sisting of cows and other cattle, hogs, horses, and chickens,
all of which stock pastured and fed upon said premises and
depended upon said river for fresh water for drinking pur-
poses; that said livestock had no other way of getting water
except by going down the west bank of said stream to the
waters of said river; and that these plaintiffs purchased and
improved said premises for a permanent home, and particu-
larly because said premises abutted upon said river and public
waterway; that the said river in its natural condition, unob-
structed, constitutes a natural public highway for these
plaintiffs, and the only public highway leading to and from
their residence; that ever since about the 1st day of Septem-
ber, 1905, the defendants had caused said public waterway
to be filled with sawlogs from bank to bank in front of plain-
tiffs' premises, and above the boom located there, and that
said sawlogs had wholly obstructed said waterway to naviga-
tion in front of plaintiffs' premises during the whole of this
period, except for a few days at a time not exceeding alto-
gether the period of three weeks from the 1st day of Septem-
ber, 1905, to the date of the trial hereof (which was about the
middle of March, 1906); that by reason of such operations

of the defendants, plaintiffs had been deprived of the use of
the river for navigation and of their rights of ingress and
egress, and many of said logs had rested or lain against the
banks of plaintiffs' lands both below and above the line of
mean high water, and that in places, certain sawlogs lie in
part upon the banks above the line of mean high water, and
that during much of this time these sawlogs have been so
closely packed and jammed in said river from bank to bank,
that these plaintiffs have been unable to use this river for any
purpose whatsoever; that the public schoolhouse in that school
district is located on the east side of the river, and the plain-
tiffs' children, notwithstanding that they have rowboats for
that purpose, are unable to use the same on said river in front
of plaintiffs' premises, to cross the river to attend school;
but are compelled to cross the river on foot over said logs,
and are in great danger on account of having to cross the
river over defendants' logs; found that plaintiffs, by reason
of the obstructions to said river, were at much greater ex-
pense to ship in their supplies, etc.; that the boom company
had kept the river, from its boom to the west bank of said
river, filled with sawlogs almost continuously since the first
day of September, 1905; that it had used that portion of
the west bank of said river belonging to plaintiffs, both above
and below the line of mean high water, as the west wall of said
boom; that the whole bed of the river was filled with logs from
top to bottom in places above the surface of the water; and
that the boom was so located and operated that it acted as a
dam, by reason of which the water backed over plaintiffs'
premises to a depth of several feet, and that such back
water overflowed portions of plaintiffs' premises to plaintiffs'
injury; that the logs are jammed and lodged in the river in
front of plaintiffs' premises above and below the line of mean
high water and against the banks thereof, grind and carry
away quantities of plaintiffs' soil, thus doing plaintiffs' prem-
ises damage, which obstruction and damages are continuous

from day to day so long as said river is jammed with logs from bank to bank, and that the logs lying partly out upon the bank, when carried down, cut away quantities of the soil and thus destroy the lands of the plaintiffs', and that at certain times the defendants during recent months have hauled the sawlogs off the banks of plaintiffs' premises into the river with a donkey engine operated upon a float in said river, and plaintiffs' premises have been damaged thereby, and will continue to be damaged so long as so used; that the defendants maintain and operate a number of splash dams upon the Humptulips river, and the branches thereof above the lands of plaintiffs, and that by reason of such splash dams and the lifting of the gates thereof, the depth of the waters in the river is raised in the vicinity of plaintiffs' premises to the extent of two feet, and that by reason of these artificial freshets, sawlogs are carried down said river and cause jams in front of plaintiffs' premises, to their injury; that plaintiffs have thereby been deprived of the use of the water of said river for navigation and for domestic and livestock purposes; that such freshets and artificial freshets damage the land and endanger the lives of the family and of the livestock of the plaintiffs; that the damages are irreparable and cannot be estimated in dollars and cents, and that said conditions will increase from time to time as the logging industry above the lands of plaintiffs increases; and much more to the same effect.

From these findings of fact, it is concluded that the plaintiffs are entitled to a perpetual injunction against these defendants, and each of them, from obstructing the Humptulips river to navigation in front of the lands of these plaintiffs, and using the said river in front of plaintiffs' premises for the purpose of storing logs, either in the water of said river or upon or against the banks above or below mean high water, from using any artificial means above the lands and premises of these plaintiffs, to increase the flow or volume of

water in front of plaintiffs' property, and other conclusions of law of similar import.

From these findings and conclusions, the court made the following decree:

"(a) That the Grays Harbor Boom Company and the Humptulips Driving Company, and the officers, agents, representatives and employees of each of said corporations, be, and they are hereby perpetually enjoined and restrained from obstructing the Humptulips river to navigation, from the mouth of said river, where it empties into Grays Harbor up to the north line of the lands and premises belonging to these plaintiffs and described in the complaint herein, and particularly from obstructing said river to navigation in front of the lands and premises of these plaintiffs, described as follows, to wit: Lot 1 in section 15, lots 3 and 4, in section 10, lots 1 and 3, the southwest quarter of the northeast quarter and the east one-half of the southeast quarter of section 9, all in township 18, north range 11 west of the Willamette Meridian, situate in Chehalis county, Washington, Where said lands abut upon said Humptulips river, of which lands and premises these plaintiffs were and are the owners in fee simple in possession of and entitled to the possession thereof, down to the line of mean high water on the banks of said river.

"(b) And from sorting, holding or rafting logs in the waters of said river in front of said lands of these plaintiffs, or upon or against the banks of said premises above or below the line of mean high water and from in any manner using the west bank of said river in front of plaintiffs' premises above the line of mean high water.

"(c) From operating any boom within said Humptulips river in such manner as by the method of operation solely to cause sawlogs to jam or fill the river so as to prevent the navigation or use of the river by these plaintiffs, for navigation in the usual manner, or from maintaining a boom in said river or obstructing said river so as to raise the water, causing plaintiffs' lands to overflow.

"(d) From operating or using any artificial means such as splash dams within said river or its tributaries above the lands and premises of these plaintiffs, to increase the volume

or flow of water past plaintiffs' premises in such manner as to injure or damage plaintiffs' property.

"(e)   From in any manner occupying, using or damaging the premises of these plaintiffs, abutting upon the Humptulips river above the line of mean high water.

"(f)   From exercising any of the powers or authority given to the defendants or either of them, by the statute of the state of Washington, or by reason of their plat or charter, in a manner that will directly cause any of plaintiffs' lands to be overflowed or damaged.

"(h)   That as to 'that portion of the plaintiffs' premises located within the defendant, the Grays Harbor Boom Company's boom, these defendants and each of them and each of their officers, agents, representatives and employees, are hereby perpetually enjoined from using the banks of these plaintiffs' lands above the line of mean high water for one side or retention wall of the boom, and the said boom company is hereby ordered and required to keep open a waterway next to the said west bank of plaintiffs' water front within said boom, which waterway shall be kept open to navigation and shall be of the width of at least fifty feet.

"(i)   And it is further ordered and adjudged that these plaintiffs do have and recover of and from the defendants herein, their costs to be taxed at $19, and that execution issue therefor."

The first question discussed is, have the respondents as riparian owners the right, as an incident of their land, of unobstructed access to the navigable waters of the stream?   In fact, the greater portion of the argument of respective counsel is devoted to this question.   It is stoutly maintained by the appellants that this question has been answered in the negative by this court, in *Eisenbach v. Hatfield*, 2 Wash. 236, 26 Pac. 539, 12 L. R. A. 632, and in subsequent cases sustaining that decision; while the respondents contend that the questions at issue here are not involved in that case.   An examination of the whole record in this case convinces us that it is not necessary to determine the scope of the *Hatfield* decision; for conceding, for the purposes of this case, that it was decided in that case—and properly decided—that a ri-

parian proprietor on the shores of the sea has no rights as against the grantee of the state to the occupancy of the shore lands in front of his upland, we do not think that this is a controlling question in this case. · As we construe the statute under which the appellants claim their rights, no grant is made to boom companies of this state which in any manner interferes with the rights of riparian owners, or of any one else, or interferes with the right of navigation to any exclusive extent. Such companies are simply empowered to do business under certain restrictions, and are entitled to a joint use of the waters of navigable rivers. The main object of the act which provides for these companies seems to be to empower them to collect fees for the booming and storage of logs; and recognizing the public importance of the enterprise, the legislature conferred the right of eminent domain upon such companies. The act creating these companies and defining their powers, privileges and duties, is not long and does not seem to us to be difficult of construction. Laws 1889-90, page 470. The first section provides that,

"Any corporation heretofore or hereafter organized in the state of Washington for the purpose of catching, booming, sorting, rafting and holding logs, lumber or other timber products, shall have the power to acquire, hold, use and transfer all such real and personal property or estate, by lease or purchase, as shall be necessary for carrying on the business of said corporation."

So far the statute seems to presuppose that the corporation will obtain all ground necessary for the operation of its business as other corporations do. It then proceeds:

"If such corporation shall not be able to agree with persons owning land, shore rights, or other property sought to be appropriated, as to the amount of compensation to be paid therefor, the compensation therefor may be assessed and determined and the appropriation made in the manner provided by law for the appropriation of private property by railways."

41—44 WASH.

The remainder of the section simply provides for a reversion in case the land is not used for the purposes specified. Section 2 provides for filing plat of surveys, etc.   Section 3 deals with the character of the construction; and the remainder of the act, with the exception of § 9, consists of regulations between the companies and their patrons.   Section 9 describes what waters are navigable, and decrees the use to be public.   So, if there is any grant by the state to these companies which would bring them within the rule announced in *Eisenbach v. Hatfield, supra*, and a multitude of similar cases, it must be found in § 1, for that is the only section which assumes to grant any public rights; and we look in vain to this section for any license by the state to boom companies to interfere in any way with the navigation of the streams, or with the use of abutting land owned by others. On the other hand, this statute, in addition to a legislative recognition of shore rights in the upland owner, as opposed at least to the rights of the boom companies, by the plainest implication imposes upon the boom company the necessity of first obtaining the property necessary for carrying on its business, either by purchase, lease or condemnation.   It was evidently the object of the law to prevent conflicting rights, instead of encouraging them by an arbitrary appropriation by the more powerful party to the controversy, and to this end the right of condemnation was bestowed.

Again, as indicating the intention of the legislature to prevent any infringement of the rights of others by these and kindred corporations, the legislature at the session of 1895 (Laws 1895, page 128), in an act relating to boom companies, entitled:

"An act to provide for the organization and incorporation of companies for clearing out and improving rivers and streams in this state, and for the purpose of driving, sorting, holding and delivering logs and other timber products thereon, fixing maximum tolls therefor"—

an act which was evidently intended simply to enlarge the

rights of booming companies—provided, in § 4, that nothing shall be construed that shall in any way interfere with the navigation of such river or stream or the use of its waters for any purpose; provided further, that

"Any such wing dams, sheer booms, dams with gates or otherwise shall not be so constructed or used as to in any manner injure or damage any lands adjacent to such stream by overflowing same or causing logs or other timber to accumulate on any land adjacent to such stream so dammed or used."

That it was intended that the provisions of this act should apply to boom companies under prior acts, is manifest from the provisions of § 8, which is as follows:

"Duly organized boom companies at present operating upon any of the streams or rivers of this state may file amended articles of incorporation to embrace the provisions of this act, and, for the purpose of time limitations mentioned in this act, the time of filing such amended articles of incorporation shall be deemed to be the time of organization thereof, but failure to comply with the provisions of this act shall work forfeiture of the rights of such corporations only so far as the same are subjoined under the provisions of this paragraph."

Practically all the rights which are granted to boom companies under the act of 1889-90 are carried forward into the act of 1895, thereby simply enlarging the rights of boom companies; and it is not to be presumed that, within the contemplation of the legislative mind, one boom company organized under the act of 1890 would be permitted to interfere with the rights of navigation, and to commit depredation upon abutting lands, which rights were not accorded to boom companies organized under the act of 1895, although they might be incorporated under a different name.

This provision of the statute was construed by this court— if, indeed, such provision was susceptible of construction— in *Carl v. West Aberdeen Land etc. Co.*, 13 Wash. 616, 43 Pac. 890, where it was held that boom companies organized

under the Laws of 1895 have no right to interfere with the navigation or use of the streams upon which they have constructed booms. This was an action to prevent the Grays Harbor and Neuskah Boom Company from interfering with the passage down the river of the plaintiff's logs. In the course of its opinion, the court said:

"The third objection is founded upon the claim of rights by the appellant boom company under the act above referred to, and a large number of authorities have been cited to show that it is competent for the legislature to provide that such boom companies may interfere with the navigation of navigable streams. But such authorities are not in point, for the reason that the legislature, in the act in question, has not attempted to confer upon the boom companies organized thereunder any such right. In § 4 of the act (Laws 1895, p. 130), after providing what such companies may do, it is provided: 'Nothing shall be constructed that shall in any way interfere with the navigation of such river or stream, or the use of its waters for any purpose.' From which it will be seen that the legislature not only did not intend to give to such companies the right to interfere with navigation, but took pains by express provision to provide that they should have no such right."

From an examination of the statute, we conclude that, with the exception of the right of eminent domain and the right to  charge and collect fees, the boom company stands upon no different footing from an individual. That the legislature did not intend to give any exclusive right of navigation to boom companies, although they may be dealing in business of great magnitude, but that they were restricted to a joint user of the waters of the stream, and that it was the plain intention to protect from their encroachments all other rights of navigation and rights of use in the waters of the river, is evident from the enactments on the subject. This being so, the boom company will be controlled by the same rule that is made applicable in the ordinary case of log driving in meandered streams.

Again, according to the testimony in this case, the appellants have taken possession of the private property of the respondents, and the statute could not confer such a right even if it were the legislative intent, for the declaration of the constitution of assertion of ownership only goes to the beds and shores of all navigable waters in this state up to and including the line of ordinary high tide, in the waters where the tide ebbs and flows, and up to and including the line of ordinary high water within the banks of all navigable rivers and lakes; and no right is asserted whatever above the line of mean high tide, which is evidently intended to be the dividing line between the rights of the public and the rights of the private individual. Again, in the interest of appellants' business, the respondents' lands are overflowed by back water, and by the use of splash dams logs are run on to their private lands and remain there indefinitely, or until it is convenient for the appellants to remove them; which action on the part of the appellants is directly in the face of the statute above quoted. To say nothing of taking or appropriating, this is certainly a damaging of property, and § 16 of article 1 of the state constitution provides: "No private property shall be taken or damaged for public or private use without just compensation having been first made or paid into court for the owner." This provision in the fundamental law was construed by this court, in Brown v. Seattle, 5 Wash. 35, 31 Pac. 313, 32 Pac. 214, 18 L. R. A. 161, and in many subsequent cases, to mean just what it said; and it can make no possible difference whether the property abuts on a street or river, or whether the invader of that right is a municipality, an individual, or a boom company; the constitutional guaranty applies equally in both cases. It has been the uniform holding of this court that the owners of the banks of rivers should be protected from ravages made by driving logs down such rivers. This policy was announced and earlier

cases reviewed in *Monroe Mill Co. v. Menzel,* 35 Wash. 487, 77 Pac. 813, where, in the discussion of the case, it is said:

"Another provision of the decree, with reference to the methods attending respondent's navigation, also calls for examination. · It will be remembered that, by its terms, the decree prohibits appellant from interfering with respondent's employees in the way of preventing them from going upon the banks of the stream upon appellant's lands, for the purpose of breaking jams of shingle bolts, so long as the going upon the banks does no injury to appellant or his lands. We think this provision of the decree is also erroneous. We believe we went as far as we should go in the interest of public convenience, when we held, in *Watkins v. Dorris, supra,* that private land owners hold the beds of unmeandered streams subject to the easement of driving timber products over the land. But we tried to make it clear in that case that the timber driver must confine himself and his operations to the highway itself—the bed of the stream—until the land owner consents to the use of the banks, or until the right to their use has been acquired 'n a lawful way. If a more emphatic statement of that rule .s necessary, we now wish to be under- stood as making it, with all needed emphasis. The funda- mental principle of right in the land owner to control his own premises, outside of the bed of the stream, must not be violated. To leave parties under such terms as this decree provides would, in many instances, invite trouble and litiga- tion. Each one would assume to be his own judge as to whether any injury is done to the land. What might appear to the land owner as injury might not so appear to the tim- ber driver, and thus a controversy would at once arise, prob- ably requiring repeated litigation to settle. The driver must know from the beginning that he must, in no event, go upon the banks of the stream in his operations without the owner's permission, and thus controversies about damages accruing in that way will be avoided. Enough controversies will arise about the manner of operating in the bed of the stream to the possible damage of the adjacent land, without adding thereto those arising from semi-legalized trespass upon pri- vate premises, which would be the case if it were judicially held that one may operate upon private lands against the owner's consent, and without compensation."

It would seem that this language might properly be applied to the facts in this case, and that under such announcements there can be no question that the appellants should be enjoined from in any manner operating their business upon the lands of the respondents; and there can be no justification for the application of a different rule where the stream happens to be meandered, as applied to damage done to the land in the nonmeandered streams, the driver of the logs being given the benefit of the same use of the water that he would have in a meandered stream.

It is claimed by the appellants, in conclusion, that this injunction cannot be sustained by reason of the rule announced by the court in *Mitchell v. Lea Lumber Co.*, 43 Wash. 195, 86 Pac. 405, to the effect that no damages can be recovered for injuries which are merely the natural result of the use of a stream as a highway, where the operations have been conducted in a reasonably careful manner; and that, inasmuch as this decree is not based on negligence, it should not be allowed to stand. This announcement was not necessary to the decision of the case in *Mitchell v. Lea Lumber Co.*, *supra*, inasmuch as it was determined that there was proof of negligence on the part of the drivers. But, whatever may be said of the soundness of the doctrine announced in that case, the question is not involved here, where there has not only been an invasion of the constitutional rights of the respondents, but an actual, permanent taking and permanent use made of respondents' land, not only by using the west bank of their land as the west wall of the boom, but by using the land itself as a storage ground for logs that escape from the boom—an actual taking and damaging which, as we have seen, could not be indulged in without previous compensation. In addition to this, when it conclusively appears that the business in which the company is engaged cannot be carried on without damaging private interests, it would seem that the rule announced in the *Lea Lumber Company* case could not

logically be applied. And, if it be true, as we said in *Monroe Mill Co. v. Menzel, supra,* that the landowner has a right to enjoin the drivers of logs from going on to his banks, even when it was conceded that no injury was done, for the reason assigned that the fundamental principle of right in the landowner to control his own premises outside of the bed of the stream must not be violated, no room is left for appellants' contention in this regard.

But, outside of that question, in this case without doubt, the respondents have a right to rely upon the protection guaranteed to them by the statute, the same statute which authorizes the organization of boom and driving companies ; (1) that they shall not have the right in any way to interfere with the navigation of the stream or the use of its waters for any purpose; (2) that they shall not have the right to injure or damage any adjacent lands, etc. If they have no right to do this, it is plain that there is no room for the application of the rule of *damnum absque injuria,* for in this kind of a case that rule is based upon the idea that a person is carrying on his business in a legal manner or under the sanction of the law ; while, as we have seen, the law in this case expressly inhibits such a use.

The argument of appellants, based upon the difference between the importance and magnitude of the logging industry and the farming and other interests on the river, an argument which is largely the basis of their whole contention, is one that ought not to appeal to an American court, where justice is dealt out with an even hand to individual and corporation, to rich and poor, to strong and weak. Every citizen of this state must, not only in theory but in practice, be accorded by the law the prompt and efficient protection of his rights, regardless of the magnitude of his interests. It is the protection of the rights which is the object of the solicitude of the law, and not the ascertainment of the mercantile value of such right.

It is contended that, in any event, the decree is too broad, and that its practical effect will be to prevent the boom company from doing business on the Humptulips river. We do not think the decree can be properly so construed. While it is true that paragraph (a) of the decree enjoins and restrains the appellants from obstructing the Humptulips river to navigation within a certain distance, and particularly from obstructing said river to navigation in front of the lands and premises of these respondents, the decree will be construed only with reference to the rights of the respondents as·alleged and proven. Paragraph (b) is necessary for the protection asked for by the respondents, and the same may be said of paragraph (c). Paragraph (d) is no stronger than the statute under which the companies are organized. Paragraph (e) refers especially to the premises of the respondents, and falls within all prior cases decided by this court. To the same effect is paragraph (f). The first part of paragraph (h) is with reference to the actual use of the respondents' lands, and the following: "The said boom company is hereby ordered and required to keep open a waterway next to the west bank of the plaintiffs' lands between its boom and said bank, the whole length of plaintiffs' water front within said boom, which waterway shall be kept open to navigation and shall be of the width of at least fifty feet," is correct upon the theory outlined by the statute, that it is the duty of the boom company to obtain the lands and rights necessary to operate their business. This construction does away with the contention, which we think is not a sound one, that the statute requires a free passage on both sides of the boom for all boats, vessels, or steam craft of any kind whatsoever, or for ordinary purposes of navigation, which would seem to be impracticable on many if not all of the streams of the state.

Construing the decree, then, with reference to the case before the court, we are inclined to the view that it is unob-

jectionable in every particular, and the judgment is therefore affirmed.

MOUNT, C. J., RUDKIN, ROOT, and CROW, JJ., concur.