[No. 37410.   En Banc.   November 17, 1966.]

AMES LAKE COMMUNITY CLUB et al., *Respondents*, v. THE STATE OF WASHINGTON, *Appellant.**

*The Attorney General, Mike Johnston* and *Joseph L. Coniff, Assistants*, for appellant.

*Lycette, Diamond & Sylvester* and *Lyle L. Iversen*, for respondents.

*Ralph W. Johnson* and *Russell A. Austin, Jr.*, amici curiae.

PER CURIAM.—We dispose of this case, concerning riparian rights on Ames Lake, on the same basis and on the

*Reported in 420 P.2d 363.

same rationale as in the Phantom Lake case (*Botton v. State, ante* p. 751, 420 P.2d 352 (1966)). As in the Phantom Lake case, the state, acting through its Department of Game, had acquired title to a lot giving access to the lake and had developed it as a public fishing access area. As in the Phantom Lake case, *supra,* the court had permanently enjoined the state from permitting public access to Ames Lake from its property.

As in the Phantom Lake case, we conclude that the injunction should not be permanent but should be continued only until the state, through its Department of Game, presents a plan for the controlled operation of its property that satisfies the trial court that the rights of other riparian owners will be adequately safeguarded.

However, the plaintiffs in this case did present an additional ground for injunctive relief not present in the Phantom Lake case. This was the contention that the state was restricted, by the reservations in the deed by which it acquired title to its property, from using that property for other than residential purposes.

The owners of the bed of Ames Lake and the land surrounding it, had a carefully conceived plan of preserving—for those who then, and subsequently, owned the land around the lake—the advantages of a privately owned lake.

The "Plat of Ames Lake, An Addition to King County Washington," included the lake and all of the property immediately adjacent to it.

The lake itself was Lot A, and around it and abutting on it were Lots 1 to 159 inclusive. Interspersed at intervals among these lots were Lots B, C, D, and E which also abutted on the lake, but were not to be sold as they were to give the owners of lots with no lake frontage a convenient access to the lake at various points. Lots 160 to 279 inclusive made a second tier of lots, separated from the lots which did abut on the lake by a 60-foot roadway, designated "Scenic Blvd.," which went entirely around the lake. Lots 280 to 295 were larger tracts beyond the second tier of lots, still further removed from the lake, and available for various uses.

The deed to each lot stated that it was "Subject to building restrictions and regulations, shown on said recorded plat." The plat contained the following statement:

As shown on the Plat Lots designated as "A" which is Ames Lake—and B, C, D, and E are the undivided and common property of the owners of all Lots in this plat for their joint recreational use and enjoyment of their families and guests and are not dedicated to the public. The development, maintenance and upkeep of tracts A, B, C, D, and E are a joint obligation of said lot owners and subject to such rules and regulations governing same, as from time to time may be adopted by a majority in interest of said owners.

The owners of the property included in the plat of Ames Lake desired to have the lake restocked with fish each year, and this they asked permission to do at their own expense; but the Department of Game refused the necessary permit, nor would the department itself restock the lake unless it had access thereto and controlled the outlet.[1] To meet this requirement, some of the parties, who had platted the property and were selling the lots, agreed to give the department Lot 61 (a waterfront lot), which was at the only outlet; and the department then bought for $500 Lots 202, 203, and 204 (not waterfront), just across Scenic Boulevard from Lot 61 and through which the outlet creek ran. The deed for the four lots was executed February 27, 1948, and was, like all other deeds given by the platters, "Subject to building restrictions and regulations, shown on said recorded plat." Among the restrictions contained in that plat, we find "All lots 1-279 *inclusive are restricted* to R-1[2] use (except Lots 189 and 190 for R-3 use)."

The state, in 1951, commenced the development of its property—clearing and grading the lots, dredging the channel, and making a substantial fill—in order to utilize (nonwaterfront) Lots 202, 203, and 204 for parking purposes and (waterfront) Lot 61 for launching of boats on

[1]The purpose of a screen at the outlet was to eliminate undesirable fish from ascending the outlet creek and getting into the lake, and to keep "state" fish, particularly the trout, "from seeking other environs."

[2]Residential use.

the lake. Some $5,000 was expended in this work, and it was all done without objection from any source. Beginning with 1952, these facilities have been available to all licensed fishermen desiring to use them during the fishing season, and great numbers avail themselves of that privilege.

Not until April, 1962, did the owners of the property within the plat adopt regulations,[3] as provided by the restrictions in the plat. The Department of Game, when advised of these regulations, immediately gave notice that it would not be bound thereby. This action was commenced some 6 weeks later by the Ames Lake Community Club, an unincorporated association, and a number of property owners within the plat, asking that title to Lot A (Ames Lake) be quieted against any claim by the state of a right to permit the public to enter thereon, and that the state be restrained from making any use of its property for the admission of the public to Ames Lake.

The state, by answer, asserted the right to use its lot adjacent to Ames Lake for public access thereto, "so that members of the public may go upon the surface of Ames Lake to fish." It also asserted the affirmative defense of laches.

The trial court found that the public use was not limited to the fishing season (as the state had contended) and that "the public continues to have access to the State's tracts and to Lot A" throughout the year.

> Members of the public going upon the lake through the access provided by the State frequently behave in a boisterous, noisy and often indecent manner and frequently litter the lake and trespass upon the property of other tract owners in the plat and a nuisance has been created to the owners of the property within the Ames Lake plat. (Finding of Fact No. 8)

---

[3]The regulations adopted were as follows:

"1. Ames Lake (Lot A) and Lots B, C, D and E, shall be used and developed exclusively for the private recreational use and enjoyment of persons owning lots within the plat of Ames Lake and their families and guests. Guests are hereby defined as persons socially entertained by owners of the property, and shall not include the general public nor persons not having personal social relations with owners of lots

Though found separately and subsequently to the foregoing finding, the trial court also found that:

The conformation of the land around Ames Lake is such that sounds are amplified, and the noise of gasoline motors or the noise from boisterous conduct may be heard throughout the tract and is annoying to residents. Gasoline motors are frequently used by members of the public gaining access to Ames Lake through the State's access way. (Finding of Fact No. 16)

(It will be noted that the owners of the property, by their regulations, prohibit their own use of gasoline motors on the lake.)

The trial court held that the action was not barred by laches and entered a decree which quieted title in all of the holders of tracts of land within the plat of Ames Lake, as tenants in common in Lot A in said plat as against any claims by the state of Washington to any rights in Lot A superior to that of the other tract holders and, particularly, as against any claims by defendant to any right to use or develop said tract A without compliance with the rules and regulations governing the same, adopted by the majority in interest of the tract owners of said plat of Ames Lake. The trial court also permanently enjoined the state, its officers and agents

from admitting the public to Lot A of the plat of Ames Lake, and from using its tracts, namely, Lots 61, 202, 203, and 204, for access by the public to said Lot A.

From this decree the state appeals.

■ Some of the judges adhere to the view that the granting of fishing privileges in any lake is vested exclusively in the state and the action should have been dis-

---

within the platted area.

"2. Lot owners shall vouch for, and be responsible for, the conduct of guests invited by them to use Lots A (Ames Lake), B, C, D or E, and shall not permit the use of their property for admitting the general public to such commonly owned lots.

"3. No commercial or public use shall be made of Lots A, B, C, D or E.

"4. Gasoline motors for the propulsion of water craft on Ames Lake (Lot A) shall not be allowed.

missed; others adhere to the view that laches was not established and that the state is bound, as any other grantee, by the reservations in its deed and that the trial court should be affirmed. However, neither of these views prevail. A majority of the court take the position that even if the reservations could have been timely enforced against the state, the other property owners in the plat have by their laches—in doing nothing to enforce them for 11 years, from 1951 to 1962, during which the state made valuable improvements, frequently restocked the lake, and permitted fishermen in large numbers access thereto—barred themselves from enforcing them.

■ The majority, however, adhere to the views expressed in the Phantom Lake case: That since the state exercised no adequate control over the conduct of its licensees, who have unreasonably interfered with the rights of other riparian owners, the injunction was properly granted but should be modified and limited as indicated in that case.

Our conclusion is as indicated in the second paragraph of this opinion, and the case is remanded to the trial court for that purpose with instructions to remove the injunction as soon as the state, through its Department of Game, presents a plan for the controlled operation of its property that satisfies the trial court that the rights of other riparian owners will be adequately safeguarded.

Each party will bear his own costs on this appeal.

OTT, J.—(dissenting in part and concurring in part)—I agree with the majority that the doctrine of laches bars the property owners resident on Ames Lake and members of the Ames Lake Community Club from enforcing the restrictive covenants in the deed to the state.

I do not agree that the injunction should be continued "until the state, through its Department of Game, presents a plan for the controlled operation of its property that satisfies the trial court that the rights of other riparian owners will be adequately safeguarded."

As pointed out in my dissent in *Botton v. State, ante* p. 751,

420 P.2d 352 (1966), one who builds his home on the shore of public waters must measure the debits of living near a public area against the credits of the scenic beauty and recreational pleasures enjoyed by those who are the owners of waterfront property.

In 11 years, the residents on Ames Lake made only one complaint relative to the public use of the lake, and this complaint related to broken glass on the public access.

The record before us establishes that, during the 11 years in question, some isolated acts of indecency by certain fishermen occurred; that there was unlawful trespassing upon the property of adjacent owners, and that certain items of personal property had been stolen. None of these offenses was ever reported to the Department of Game or to local authorities. None of these offenses has any relationship to violation of the fishing laws, but such offenses do constitute violations of the general criminal statutes of the state of Washington. RCW 9.66.050, 9.68.040, 9.83.060.

Isolated instances of misbehavior on the part of a few individuals do not constitute a nuisance. *State ex rel. Warner v. Hayes Investment Corp.*, 13 Wn.2d 306, 125 P.2d 262 (1942). Further, as pointed out in my dissent in *Botton v. State, supra*, the Department of Game, through its officers, has no power to enforce these general criminal statutes. This power and authority rests solely in those county officers whose duty it is to enforce the general criminal laws. These county officials cannot be charged with dereliction of duty, when the residents of Ames Lake, in the 11 years' time during which these abuses were supposed to have occurred, did not consider them of sufficient importance to report them to the county officers.

Finally, the majority have not set out any standards by which the Department of Game can legally safeguard the rights of riparian owners against those few who violate the general misdemeanor statutes of this state. In the absence of such standards, what "plan" could the Department of Game propose which would insure that persons would not trespass upon the property of others, throw refuse in the lake, or urinate in the lake? Even if it were possible to

have a King County deputy sheriff continuously stationed on Ames Lake, how could he prevent persons from committing misdemeanors of this type, when his only authority would be to arrest the perpetrator *after* the offense was committed?

In my opinion, the injunction should be dissolved, and if, during the next 11 years, a resident on Ames Lake observes the general misdemeanor statutes being violated, he should seek prosecution of such offenders through the law enforcement agencies of the county.

ROSELLINI, C. J., HUNTER and HALE, JJ., concur with OTT, J.

March 2, 1967. Petition for rehearing denied.