[No. 37916.    En Banc.    November 17, 1966.]

JOHN C. BOTTON et al., *Respondents*, v. THE STATE OF WASHINGTON, *Appellant*.*

*The Attorney General, Mike Johnston* and *Joseph L. Coniff, Assistants,* for appellant.

*Clinton, Moats, Andersen & Fleck,* by *James A. Andersen,* for respondents.

*Ralph W. Johnson* and *Russell A. Austin, Jr.,* amici curiae.

*Reported in 420 P.2d 352.

HILL, J.—The State of Washington, through its Department of Game, acquired by purchase a waterfront lot on Phantom Lake (nonnavigable) which it has developed to be used as a public fishing access area. Its use or abuse, for that purpose, has resulted in the present action by other owners of waterfront property on the lake, asking that the state be enjoined from maintaining its public access area.

The trial court made very comprehensive findings of fact:

Since the defendant, through its Game Department, put in the public access area, the plaintiffs have suffered the following as a result of it:

1. The fair market value of plaintiffs' property has been decreased.

2. Thievery on the lake has greatly increased, particularly the stealing of boats, oars, outdoor furniture, tools and miscellaneous items of personal property of all kinds. In many of the cases it was definitely ascertained that the thieves gained access to the lake from the public access area.

3. Persons relieving themselves in the lake as well as on the property and front yards of various of the plaintiffs, to the considerable embarrassment and annoyance of the plaintiffs, their families and guests.

4. Beer cans, worm cans, sandwich bags, pop bottles, rafts, and other assorted trash has been deposited in the lake and on the plaintiffs' beaches in considerable quantity.

5. Repeated and frequent trespasses on the plaintiffs' front yards, docks, beaches and property.

In addition to the trespasses by persons coming in by the access area, numerous other trespassers have crossed the plaintiffs' yards, docks, beaches and property from other adjoining residential areas, and which trespassers, when confronted by the plaintiffs, have justified their actions by saying to the effect that, "Well, now, it's a public lake, isn't it."

6. Numerous of the plaintiffs, their children and grandchildren, have severely and frequently been cut by broken beer bottles left on the beaches.

7. Fishermen using plaintiffs' docks, and fishing immediately adjacent to their beaches and front yards, would refuse to leave when requested and would stare and make remarks when plaintiffs, their wives and daughters would try to use their beaches for sun bathing,

swimming or the entertaining of guests. The plaintiffs, as a result of this, cut down very considerably in their use of their front yards and beaches.

8. Although hunting and shooting on the lake are illegal, hunters come in and hunt and shoot on the lake. Persons also come in and shoot at ducks with air rifles.

9. Speed boating on the lake has greatly increased. In some cases it has increased to the extent that it has become a danger to the plaintiffs' children.

10. The public use of the lake has interfered with the plaintiffs' use of the lake for boating, swimming, fishing and recreational purposes.

11. The noise on the lake has substantially increased.

From these findings, the trial court drew the legal conclusions that the state's opening up of the lake to public use through its access area, without resorting to eminent domain, constituted a taking and damaging of private property without compensation to the owners thereof; and that the state's opening up of the lake to public use constituted an unreasonable interference with the rights of the plaintiffs.

Based on these conclusions, the trial court entered an injunction enjoining the state

from maintaining its public access area on Phantom Lake as a public access area and from admitting the public to Phantom Lake and across the access area until such time as it condemns the plaintiffs' property and property rights in the manner provided by law.

The state appeals, urging that as a riparian[1] owner on a nonnavigable lake it can permit the public to enjoy the right to fish from boats over every portion of the lake so long as this does not constitute an unreasonable interference with the rights of the other riparian owners. This implies an obligation to police and control the use of the nonnavigable lake by the public to prevent such use becoming an

---

[1]The state refers to the plaintiffs as littoral owners, and to their littoral rights. We recognize that there is ample and impeccable authority for the proposition that a riparian owner is one whose land abuts upon a river and a littoral owner is one whose land abuts upon a lake. See 25 A, Words and Phrases 34. However, current usage not only in our statutes but in our decisions has made riparian an acceptable term as to land abutting upon either rivers or lakes.

unreasonable interference with the rights of the other riparian owners thereon.

Any consideration of the rights of riparian owners and the owners of the beds of lakes must be in the light of the applicable statutes, particularly RCW 90.03.010, enacted in 1917, which declares that "Subject to existing rights all waters within the state belong to the public."[2]

Our decisions relating to nonnavigable lakes fall into two classes, i.e., where we have been concerned with the right to appropriate water from nonnavigable lakes for use on the land of nonriparian owners or for public use, such as municipal water supply; and where we have been concerned with rights relative to the use of the surface of the water by the riparian owners.

The first class of cases[3] have significance here only because they indicate the existence of and the importance placed on the riparian rights of bathing, boating, swimming, and fishing (at least in the nonarid portions of the state).

In the present case, we have no conflicting interest between the owners of the land abutting the lake and the owners of the lake bottom, as the upland owners also each own a definitely surveyed portion of the lake bottom and pay taxes levied thereon just as they do on their upland property.[4]

---

[2]"The power of the state to regulate and control the waters within the state shall be exercised as hereinafter in this chapter provided. Subject to existing rights all waters within the state belong to the public, and any right thereto, or to the use thereof, shall be hereafter acquired only by appropriation for a beneficial use and in the manner provided and not otherwise; and, as between appropriations, the first in time shall be the first in right. Nothing contained in this chapter shall be construed to lessen, enlarge, or modify the existing rights of any riparian owner, or any existing right acquired by appropriation, or otherwise. They shall, however, be subject to condemnation as provided in RCW 90.03.040, and the amount and priority thereof may be determined by the procedure set out in RCW 90.03.110 through 90.03.240." RCW 90.03.010

[3]Because of its length, this footnote appears at the end of the opinion as an addendum.

[4]Usually in our reference to riparian rights in lake cases, we are discussing the rights of owners whose property abuts on a nonmeandered, nonnavigable lake. Usually, but not necessarily, they have title to some portion of the adjoining lake bed. Such an owner may or may not have title to the center of the lake, or to any portion of the bottom of the

The lake is small and shallow, covering 63.2 acres, and with depths running from extremely shallow to a maximum of 47 feet near the middle. The shore of the lake is partly surrounded with nice homes (most of the homeowners reside on the lake the year-round) and partly by as yet undeveloped properties. It lies between Lake Washington and Lake Sammamish (within only a few hundred feet of the latter), both of which are large, navigable lakes with many public access areas, parks, and beaches. There are no commercial establishments, resorts or public beaches on Phantom Lake. Nor were there any public streets, roads, or street ends which would give the public an access to the lake, until the state, acting through its Department of Game, acquired approximately a hundred feet of lake frontage, extending back some 800 feet to a public thoroughfare, and developed it to provide an access for fishermen and their boats.

There has been no serious attempt by the state to limit access to the lake to fishermen; and the trial court found that this access area had been open to any member of the public. We do not question the right of the state, as a riparian owner, to ignore the county's zoning regulations and to permit the public, as its licensees, access to the

lake. As land was patented, the fee to lake beds under nonnavigable waters, included within the land conveyed, passed to the patentee. Thus an 80-acre lake might lie all in one quarter section, or it might be so situated that portions of it would be in two, three or four different quarter sections of the same section, or it could be in two, three, or four different quarter sections in each of two, three, or four different sections. The division of the bed of a lake into four or five different ownerships of varying size is well illustrated by the map which is made a part of the opinion in *Duval v. Thomas*, 114 So.2d 791 (Fla. 1959). See also *Johnson v. Seifert*, 257 Minn. 159, 100 N.W.2d 689 (1960).

It is necessary to remember, however, that riparian rights do not stem from the ownership of a portion of the lake bed, but are an incident to the ownership of the shore, whether the lake be navigable or non-navigable. *Johnson v. Seifert, supra; Flynn v. Beisel*, 257 Minn. 531, 102 N.W.2d 284 (1960). However, there are no riparian rights in the owners of lands bordering on navigable waters of this state, as against the state or persons claiming under it. *Hill v. Newell*, 86 Wash. 227, 230, 149 Pac. 951 (1915); *State v. Sturtevant*, 76 Wash. 158, 163, 135 Pac. 10.35 (1913). Const. Art. 17, § 1.

lake over its property. There is, however, a limitation, and that is that it cannot permit such use of its property as constitutes an unreasonable interference with the rights of the other riparian owners.

We have stated the law applicable in the present case quite succinctly in *Snively v. Jaber*, 48 Wn.2d 815, 821, 296 P.2d 1015, 57 A.L.R.2d 560 (1956):

> We hold that, with respect to the boating, swimming, fishing, and other similar rights of riparian proprietors upon a nonnavigable lake, these rights or privileges are owned in common, and that any proprietor or his licensee may use the entire surface of a lake so long as he does not unreasonably interfere with the exercise of similar rights by the other owners. This rule does not have the effect of making the nonnavigable lake public, since a stranger has no right to enter upon the lake without the permission of an abutting owner. The rule we have announced affords equal protection to the interest of all riparian owners in the use of the water and seeks to promote the greatest beneficial use by each with a minimum of harm to other owners.

In that case, the defendant Jaber had a dance hall, picnic grounds, and a swimming area on Angle Lake (nonnavigable) and rented some 30 rowboats to the public. The conduct of the licensees in rented rowboats was such that the trial court found it necessary to enjoin that operation for a 2-year period, and this we affirmed.

The depredations and conduct of Jaber's licensees, which warranted an injunction in that case, could be characterized as a Sunday-school picnic as compared with the indecencies and obscenities to which the other riparian owners on Phantom Lake have been subjected. Added to this is the physical danger to other riparian owners, their children and grandchildren from broken beer bottles left on the beaches and from the operation of speedboats dangerously close to bathers and swimmers near the shore. While the trial court's injunction was justified at the time of trial, it was too extensive in time and was not properly conditioned as to termination.

The dedicated people who make up the great fishing fra-

ternity in this state should not be deprived of the opportunity and pleasure of fishing for perch, crappie, and the like (the water is too warm for trout) because of the conduct of a relatively few hooligans.

The state, as a riparian owner, does not have to acquire by condemnation the rights of the other riparian owners before it permits fishermen in reasonable numbers access to the waters of Phantom Lake; but it does have the obligation, and counsel for the state so concede, to so regulate the number and conduct of its licensees as to prevent any undue interference with the rights of other riparian owners.

The injunction should be continued only until the state, through its Department of Game, presents a plan for the controlled operation of its property that satisfies the trial court that the rights of other riparian owners will be adequately safeguarded. The state is entitled to all the rights of a riparian owner, but it should also accept the responsibility of a riparian owner for the conduct of its licensees.

We are in accord with the trial court's conclusion, from the facts in this case, that there has been an unreasonable interference by the state's licensees with the rights of other riparian owners and that an injunction was properly granted, but it should be modified and limited as indicated herein; and the cause is remanded for that purpose.

Each party will bear his own costs on this appeal.

DONWORTH, WEAVER, and HAMILTON, JJ., concur.

## ADDENDUM

[3]This addendum is not intended to be definitive or authoritative, but simply to indicate the limitations which have been placed on the broad and sweeping statements in *Proctor v. Sim,* 134 Wash. 606, 236 Pac. 114 (1925), and to indicate the recognition of the extent and value of the riparian rights of bathing, boating, swimming, and fishing in the non-arid portions of the state.

In *Proctor v. Sim, supra,* the plaintiffs owned the bed and the banks of Duck Lake, located entirely within their land. It was about 1,300 feet in length and 1,000 feet in width and covered about 25 acres. Its maximum depth was 50 feet; it dropped off sharply on all sides, except the north where there was a sandy beach. It lies within an arid district in the eastern part of the state.

The defendants had established a pumping plant on the shore of the lake and ran their pumpline across the plaintiffs' land for a distance of 45 or 50 feet to an irrigation ditch, and had, for 3 years, pumped water into that ditch for the purpose of watering 250 acres of non-riparian orchard land. (There was no showing that this permanently lowered the water level of the lake, or that the plaintiffs' property was damaged thereby.)

The plaintiffs asked damages for the trespass upon their lands, and the value of the water taken. The trial court granted $100 damages for the trespass, but refused any relief on account of the water taken. The Supreme Court affirmed, stating:

> Our conclusions are:
> (1) That Duck lake is non-navigable.
> (2) That the appellants own the shores and bed thereof.
> (3) That they do not own or have a right to control its surplus waters.
> (4) That their only existing or vested right is the beneficial use of the waters for irrigation and domestic purposes to the extent here-inabove mentioned by us, and that any surplus waters are subject to appropriation for irrigating non-riparian lands. (p. 619)

The court gave its interpretation of "the existing rights" of any riparian owner, which are specifically reserved by RCW 90.03.010, by asking a question and then answering it:

> What, then, are "the existing rights" of the appellants as riparian owners which are to be considered as vested rights and may not be interfered with? Our answer is that it is the right to the beneficial use of such portions of the waters of the lake as are either directly or prospectively, within a reasonable time, proper and necessary for the irrigation of their lands and for the usual domestic purposes. In *Brown v. Chase, supra,* [125 Wash. 542, 217 Pac. 23] we expressly so held with reference to the waters of a non-navigable stream. It is true that the common law would give the appellants other existing rights, as, for example, the right to have the waters lap their shores as they were by nature wont to do and undisturbed and undiminished except by the exercise of similar rights in other riparian owners, if any there were. . . . But much of the English common law of riparian rights is inapplicable to the arid portions of this state and is incompatible with our institutions and conditions. For years past, the trend of our decisions and the tenor of our legislation have been to restrict and narrow the common law of riparian rights, and in the case of *Brown v. Chase, supra,* we completely abandoned the idea that the riparian owner is entitled "to the uninterrupted flow of the waters on and past his premises," and that none but riparian owners could make use of such water. All the right they now have by virtue of their riparian ownership is the beneficial use of the water, whether of a non-navigable stream or of a non-navigable lake. (pp. 615-616)

It must be noted that this very broad statement may be limited to the arid portions of this state; and that, in subsequent cases in the western part of the state, a lowering of a lake or an interference with its riparian uses creates liabilities and, on occasion, a necessity for condemnation.

It must be noted, too, that the court affirmed the judgment insofar as it related to trespass; and it casts no light on how a nonriparian owner, desiring to use surplus waters in a nonnavigable lake, can do so without a trespass.

*In re Martha Lake Water Co. No. 1,* 152 Wash. 53, 277 Pac. 382

(1929): The state supervisor of hydraulics had entered an order granting a permit to take the quantity of water applied for from the lake for a period of 3 years.

A number of persons owning property bordering on the lake with riparian rights appealed this order to the Supreme Court.

Martha Lake (nonnavigable) was a small, narrow body of water covering approximately 59 acres, with an average depth of 20 feet. It is 12 miles from Everett and 20 miles from Seattle. Sometime earlier, the owner or owners of the property to the north, west, and south of the lake platted the same—much of which had been sold to individual owners. The tracts riparian to the lake sold for $1,000 per acre, the nonriparian land for $300 per acre. The riparian owners purchased their property because of its access to the water for bathing, boating, swimming, fishing, and for summer homes. Summer homes and summer resorts had been constructed by riparian owners. If the permit granted by the supervisor of hydraulics had been sustained, it would have lowered the water in the lake approximately 12 inches below mean low water mark during the dry season. The effect would have been that the water's edge would recede from 8 to 50 feet, which would have been a material and substantial damage to each of the protesting riparian owners.

No indication is made of the use to be made of the water to be removed under the permit, except that it was to be used on nonriparian land.

The trial court reversed the order of the supervisor of hydraulics and enjoined the water company from lowering the water in Martha Lake until it should have acquired the right to do so by eminent domain.

This court affirmed, distinguishing *Brown v. Chase*, 125 Wash. 542, 217 Pac. 23 (1923), saying:

> The question there involved was the ownership of the water, which is a different question from that before us at the present time. (152 Wash. at 55)

And then distinguished *Proctor v. Sim, supra*, saying:

> The case of *Proctor v. Sim*, 134 Wash. 606, 236 Pac. 114, followed *Brown v. Chase, supra*, and applied the doctrine of that case to a non-navigable lake. There was not there involved any question of damages to the riparian proprietor by reason of the lowering of the water in the lake.

*Litka v. Anacortes*, 167 Wash. 259, 9 P.2d 88 (1932): In 1924, the city of Anacortes commenced to pump water from Lake Campbell (nonnavigable), some 320 acres in extent; average depth 8 to 10 feet. The city installed dams at the outlet to raise the level of the lake; however, by 1931, the lake was nearly dry, or, as testified, "it was practically a *mud flat*."

The plaintiffs had acquired real property bordering on Lake Campbell long before the city established its pumping station. They constructed a dwelling house, a bath house, several cabins, and a dock. They operated a small store, served meals, rented boats, conducted a bathing beach, a campground, had cabins for rent to hunters, fishermen and bathers. They used the property almost exclusively as a pleasure resort,

and it had no value for agricultural purposes. They brought an action against the city for $23,500, claiming a reduction in value of their property from $25,000 to $1,500 by the draining of the lake.

From a judgment entered on a verdict of $7,000, the city appealed. This court affirmed the judgment, saying that the city's action in draining the lake was a taking or damaging of property without just compensation having been made; and that the filing of a claim is not a condition precedent to an action against a city for the appropriation of property for a public use without having first paid just compensation.

*In re Clinton Water Dist.*, 36 Wn.2d 284, 218 P.2d 309 (1950): Deer Lake (nonnavigable), some 112 acres in extent; maximum depth 50 feet, is in Island County. The land bordering on the lake had been divided into 26 privately owned tracts. Some of them were wholly in their natural and unimproved state. Others had been improved and were being used for residential, agricultural and commercial purposes. The tracts most suitable for country lakeside homes were of sufficient area so that a resident might have a garden and domestic animals and fowls. The owners of three tracts used their properties for commercial purposes, such as renting cabins, camping and picnic facilities, and boats. One property owner operated a 12-acre tract planted to loganberries. This tract sloped toward the lake and required intensive fertilization.

The lake afforded opportunities for boating, bathing, swimming, and fishing by the residents and the patrons of the commercial places. Access to the lake also permitted the use of its water by the livestock and fowl of the property owners. The full use of the land necessarily resulted in surface drainage and seepage into the lake other than that which is natural.

The Clinton Water District desired to appropriate from Deer Lake 0.155 cubic feet of water per second for domestic uses. The state hydraulic engineer refused to permit the district to appropriate the water from Deer Lake until it had condemned the riparian rights affected by such appropriation.

That action was in harmony with *Burrows v. Grays Harbor Boom Co.*, 44 Wash. 630, 87 Pac. 937, and *In re Martha Lake Water Co. No. 1.*, 152 Wash. 53, 277 Pac. 382. (36 Wn.2d 286)

In the condemnation action, the trial court found that there would be no actual physical damage to the riparian lands by the diversion of the water of the lake due to the lowering of the water level, as in the *Martha Lake* case, but held that the property owners were entitled to recover compensation for depreciation of $145,473 in the market values of their property.

This court affirmed the judgment for $145,473, commenting that though the total award would make the cost to the water district prohibitive, that such is the situation in which many condemnors have found themselves.

As the majority and dissent pointed out, the depreciation in values was occasioned not by the taking of the water or the lowering of the lake, but by the probability that the water being taken for domestic

purposes would result in boating, bathing, swimming, and fishing being prohibited or restricted, as well as other uses relating to agriculture and the keeping of domestic animals.

This case indicated that bathing, boating, fishing, swimming are riparian rights which must be condemned before they can be prohibited or restricted.

FINLEY, J. (concurring specially)—We are confronted in this appeal with a complex natural resources problem certain to become more and more acute in this age of a geometrically increasing demand by more and more people for outdoor recreational and leisure time activities. The problem is one of insuring that the greatest possible number of Washingtonians, and others, are able to utilize reasonably the natural resources of our state for recreational activity. With respect to the particular outdoor activity involved— fresh water fishing—the following developments must be considered: (a) the increasing interest and recreational needs of the public in fishing in the nonnavigable lakes of the state, (b) the concomitant establishment, by the state, of hatcheries for the propagation of game fish, (c) coupled with the acquisition of water-front, public-access areas, and (d) the stocking of nonnavigable lakes with the fry or young game fish produced in the aforementioned hatcheries.

In the instant case, a problem has arisen seemingly because of a combination of two factors: (1) the state has not acquired complete ownership of all the water-front property on the lakes in question; and (2) because, in fact, much of the water-front property is held in private ownership by numerous individuals. Many of these riparian property owners have constructed summer or year-round residences. They have an interest, and obviously certain rights, in the use and enjoyment of the lake property they own. Fishing the lake in question does not constitute their only interest; it represents only one of the several interests and rights which riparian owners exercise or possess in conjunction with their individual ownership of lake water-front property. Added to this puzzle is the factor implicit in RCW 90.03.010 that, "subject to existing rights all waters within the state belong to the public."

The problem is difficult, but not an insolvable one. It is, it

seems to me, typical of juristic problems requiring a balancing of interests and rights in the great and time-honored tradition of the common law. We are presented with the legal concept of state ownership of the waters of the nonnavigable lakes of the state. Additionally, since the state has actually acquired—and in effect holds in quasi private ownership—certain lake frontage property on Phantom Lake, the legal concept of "riparian rights," as acquired by the state, must be added to the puzzle. Also to be added to the brew is the legal concept of the "riparian rights" of the numerous individuals who hold in private ownership other water-front or lake-frontage property on Phantom Lake. A further additional ingredient is the fact that the state has expended funds in developing a public-access area, and that some effort was made to stock Phantom Lake—apparently, with acquiescence and even encouragement from other owners of lake-front property. But trouble has come to what otherwise would be an idyllic recreational haven to be enjoyed reasonably by both the abutting property owners as well as members of the public. Obviously, the shattering of this Shangri La for followers of Isaac Walton arises from *the uncontrolled, indiscriminate public use*, and, more importantly, the *destructive abuse*, of the recreational potential of Mother Nature afforded by Phantom Lake and supplemented by the fish stocking and other efforts of the Department of Game.

If the problem is approached strictly in the sense of the legal concept of "riparian rights," its solution will be a restricted and limited one, and probably inadequate, in terms of its recognition of either the rights of the public or the rights of the individual lake-front owners. The same kind of danger or limitation is apparent in approaching the problem solely in terms of the legal concept of state ownership of the waters of nonnavigable lakes. Again, in the best tradition of the common law, some gloss upon the legal concept of "riparian rights" and upon the legal concept of state ownership of the waters of the lake seems indicated and necessary for a juristic accommodation of the conflicting interests and rights of members of the public

and the private owners of water front on Phantom Lake. Without employing or adverting to the foregoing nomenclature, or characterization, it seems to me the reasoning of the majority opinion by Judge Hill resolves the problem in a common-sense, practicable way—again, in the best tradition of the common law—and that the results reached constitute an adequate and highly desirable solution of the problem involved.

It may be said that the resolution of the problem as proposed in the opinion by Judge Hill means regulation and regimentation, and that this would constitute an undesirable and unnecessary restriction upon sports fishermen—in fact, an interference with the rights, the liberty, and the freedom of members of the public who like and indulge in fishing as a highly desirable outdoor recreational activity. Thinking or reasoning of this nature probably has its antecedents in pioneer days and the frontier history of this state and was quite appropriate to that era. But the answer to this nostalgic train of thought, and I believe an obvious answer, is that we are no longer living in a backwoods, frontier society. Many new people and families are coming to this state, and our population is increasing at an annual rate of between fifty and sixty thousand per annum. If present members of the public and our expanding population over the next several years are to enjoy the beauty, the outdoor recreational potential of the natural resources, and the assorted other outdoor blessings of nature in the Northwest, some reasonable regulation is not only desirable in the indicated area—it is absolutely essential. It is a fact of life of which we can even take judicial notice that all members of the public are not sensitively and appropriately appreciative of the beauties of nature and the outdoor recreational resources with which we are abundantly blessed at the present time in this state. There should not be—in fact there cannot be—overweening sympathy for those whose conduct is destructive of the beauties of nature and the outdoor recreational resources to which more orderly and appreciative members of the public, as well as private land and home owners, should be justly and rightly entitled for

many generations to come. Hooliganism is hooliganism—whether deliberate or unthinkingly negligent. Mother Nature has a way of taking care of those few creatures who foul their own nests. Society is no less entitled to, and should accomplish, the same results through common sense and reasonable regulation of resource utilization.

The Department of Game of the state of Washington has done an admirable job in developing and increasing sports fishing facilities in the waters of this state. The department has indeed performed a great public service in thus planning and developing healthful, wholesome, and highly desirable outdoor recreation facilities for our citizenry. But this picture of public service is yet somewhat incomplete. The sovereign state, represented by the Department of Game, cannot simply in effect walk away from this idyllic picture with a feeling that a fine public service mission has been fully accomplished, and that, willy-nilly or otherwise, the commendable fishing facilities which have been created will take care of themselves, or that the public, through self-imposed restraints, will take care of most of the problems relative to conservation and protection of their opportunities to engage in and to enjoy fishing on the nonnavigable lakes. Furthermore, it may be somewhat regrettable that the modern view of the judicial function does not encompass the express or tacit encouragement of "spontaneous" vigilante activity in order to take care of the hooligan element; *i.e.*, the small minority who can't, won't, or don't give a continental about the rights of others, as demonstrated by their abuse and desecration of lake fishing and the wonders of nature in this state. Paraphrasing, in part, Judge Hill's cogent majority opinion, it seems to me that the state can permit the public to enjoy the right to fish Phantom Lake so long as this does not constitute an unreasonable interference with the rights of all concerned. But this implies an obligation on the part of the state to patrol, police, and regulate the use of the lake by the public, and others, to prevent the use by any from becoming an unreasonable interference with the right to reasonable use of the lake by all concerned.

For the reasons indicated, I find myself in substantial agreement with the reasoning of the majority opinion by Judge Hill, and I concur with the results reached therein.

OTT, J. (concurring in part and dissenting in part)—The trial court permanently enjoined the state of Washington "from maintaining its public access area on Phantom Lake as a public access area and from admitting the public to Phantom Lake and across the access area *until such time as it condemns the plaintiffs' property and property rights* in the manner provided by law." (Italics mine.)

The majority reject the trial court's conclusion in this regard and hold: *"The state, as a riparian owner, does not have to acquire by condemnation the rights of the other riparian owners before it permits fishermen in reasonable numbers access to the waters of Phantom Lake."* (Italics mine.)

I concur in this part of the majority opinion.

I dissent to that portion of the opinion which states: "The injunction should be continued only until the state, through its Department of Game, presents a plan for the controlled operation of its property that satisfies the trial court that the rights of other riparian owners will be adequately safeguarded."

The trial court found that, after the access was opened, thievery increased, persons relieved themselves in the lake and on the premises of the plaintiffs, and debris was thrown in the lake and on the beaches. These acts are not violative of the game laws, but do violate the general misdemeanor statutes which are enforceable by proper complaint to and arrest by the county officials who are charged with general law enforcement.

In the instant case, the public was invited to use the public access at Phantom Lake in a lawful manner. Only a negligible number used the public access and the lake in an unlawful manner. Those who used the premises legally should not be punished by permanently enjoining them from their proper use thereof because of the misconduct of the few. To so construe the law is to hold that, for

example, the public will be enjoined from the use of public highways because some members of the public openly violate the motor laws of the state. I know of no statute or previous decision of this court that bans the use of a public area by the public because some members of the public have violated positive statutes. The remedy is and always has been that those who violate the law are punished accordingly.

The Department of Game does have the power to regulate speedboating on the lake and to regulate the use of motors, but, as to these items, the riparian owners made no complaint to the department prior to trial, nor did they previously request that such use be limited in any manner.

In my opinion, the department lawfully acquired access for the public on Phantom Lake. The members of the public who use the lake unlawfully should be punished therefor as the law provides. The remedy of injunction should apply only to those who have violated the law. There is no authority in law or in equity to enjoin all members of the public for the misconduct of a few.

Finally, the real purpose of this action is to establish a private fishing lake for the use and benefit of the abutting owners, to the exclusion of all others. The plaintiffs contend: "The public use of the lake has interfered with the plaintiffs' use of the lake for boating, swimming, fishing and recreational purposes."

The legislature, in the proper exercise of the state's police power, has created a Department of Game and of Fisheries to provide facilities and a means of access to various lakes in this state so that persons duly licensed to fish may do so. Phantom Lake has been selected by the department for public fishing, and access thereto has been acquired for this purpose. Every licensed fisherman has a legal right to use these facilities because the legislature has ordained that all surface waters of nonnavigable lakes belong to the public (RCW 90.03.010), and that "the game fish in the waters thereof [the state] are the property of the state." RCW 77.12.010.

Riparian or abutting property owners residing upon

nonnavigable lakes must likewise obtain a license to fish in these state waters. A riparian owner's right to fish is predicated upon his having a license so to do, and, when the license is obtained, it carries with it no greater right or fishing privilege than a license issued to a nonriparian licensee.

Phantom Lake has been open for public fishing continuously since 1926. It is not a popular fishermen's lake because it is stocked only with spiny ray fish. On opening day in 1963, only 50 fishermen appeared, who caught a total of 9 fish. The evidence was undisputed that seldom were more than 6 boats on the lake at any one time. It is this limited use by the public that the riparian owners wish to exclude entirely.

The majority sustain the injunction until such time as the Department of Game "presents a plan for the controlled operation of its property that satisfies the trial court that the rights of other riparian owners will be adequately safeguarded."

With this holding, I do not agree for the following reasons:

(1) One who builds his home on the shore of public waters of this state is aware that the public will use those waters for recreational purposes, and that such use may be abused by relatively few members of the public and by other riparian owners. The debits of such living must be measured against the credits of the scenic beauty and the many recreational pleasures enjoyed by those who are the owners of waterfront property.

(2) The majority do not suggest what type of "plan" will be acceptable to this court. Are 50 boats on opening day and less than 6 boats a day thereafter too many on this 63-acre lake? I do not believe that this use is excessive or that regulations limiting the number of boats on Phantom Lake have been shown to be necessary.

Should the "plan" of the game department require that the Sheriff of King County station a deputy on Phantom Lake from daylight until dark to keep under surveillance the operators of the 6 boats in order to arrest the offenders if the general misdemeanors complained of are committed?

I doubt whether the sheriff could find, much less afford, sufficient officers to police so intensively the myriad lakes in King County.

Should the "plan" require that the game department be authorized to police all of the lakes of this state, including Phantom Lake, to prevent violation of the general misdemeanor laws? Such a plan must be submitted to the legislature, not to the courts. The legislature has vested in the game protectors of this state limited authority to enforce only the game laws. RCW 77.12.070. A game protector has no more authority to arrest a person for general misdemeanors than has a riparian owner.

The legislature, in the exercise of its discretion, has vested solely in the local authorities power to enforce the general misdemeanor laws. The record before us establishes that the riparian owners on Phantom Lake never sought the aid of such officers when they observed these laws being violated.

Any "plan" which the game department might suggest would be advisory only to those authorities whose duty it is to enforce the general misdemeanor laws of this state.

For the reasons stated, the injunction should be dissolved and the action dismissed.

ROSELLINI, C. J., HUNTER and HALE, JJ., concur with OTT, J.

---

March 2, 1967. Petition for rehearing denied.