[No. 1360-2. Division Two. March 2, 1976.]

ELBERT M. CLIPPINGER, ET AL, *Appellants*, v. GORDON L. BIRGE, ET AL, *Respondents*.

---

[18]*See In re Wallace*, 38 Wn.2d 67, 69, 227 P.2d 737 (1951).

*Thomas H. Oldfield* and *Mann, Copeland, King, Anderson, Bingham & Scraggin,* for appellants.

*A. E. Hammermaster* and *Hammermaster & Robbins,* for respondents.

REED, J.—This is the second round of a dispute between the parties arising out of a claim by plaintiffs Clippinger to certain rights of access to and use of the waters of Lake Tapps in Pierce County. Both parties own tracts in the plat of Lake Tapps Tacoma Point. Plaintiffs' tract lies to the north of Dike Road which separates it from the lake. Defendants own lot 42 block 2, which lies south of the Dike Road and abuts on the east side of a small inlet created when Dike Road was constructed to close off an outlet channel during the original formation of the lake.

In 1969 plaintiffs brought suit against defendants claiming damages for destruction of a small dock which had been placed in the inlet by the plaintiffs' predecessors in interest and seeking to enjoin defendants from interfering with plaintiffs' access to Lake Tapps over Dike Road. Defendants answered alleging ownership of a strip of land lying along the south margin of Dike Road and asking that the plaintiffs be enjoined from trespassing thereon.

After trial of that suit the court found that defendants were the owners of the land described in their pleadings and that plaintiffs' dock was located partially on defendants' land and partially on the bed of Lake Tapps which was owned by Puget Sound Power and Light Company. Plaintiffs were awarded $250 for damage to that portion of the dock located on the lake bed, but plaintiffs were perma-

nently enjoined from going upon defendants' described real property. No appeal was taken from that judgment.

The present lawsuit arose when defendants constructed a bulkhead on the disputed strip, placed fill dirt behind it and otherwise interfered with plaintiffs' access to the inlet over Dike Road. Plaintiffs again sought to enjoin defendants from interfering with their rights and the rights of the public to use the lake for recreational purposes and sought damages for past interference and harassment. After trial to the court findings of fact, conclusions of law, and judgment were entered in favor of the defendants; plaintiffs appeal, assigning error to the trial court's findings that (1) the former action was res judicata on the issues of the existence and ownership of the strip of land in question; (2) the strip existed in fact and was owned by defendants; (3) plaintiffs had no right to use Dike Road for access to Lake Tapps; and (4) plaintiffs had not suffered mental or emotional harm as a result of intimidation and threats by defendants.

We resolve all issues favorably to the defendants and affirm.

Some years ago, Puget Sound Power and Light Company, hereinafter called Puget, created Lake Tapps as a storage facility for generating electric power. In forming this artificial reservoir, several natural outlet channels were dammed and dikes constructed to maintain the water level; it is on one of these that Dike Road was constructed. On June 22, 1954, Puget conveyed to the Lake Tapps Development Company, hereinafter called Company, the major portion of the lands surrounding the lake. The description of such lands and some of the pertinent provisions of the deed are as follows:

> All those tracts or parcels of land *within that certain perimeter hereinafter described which lie between said perimeter and the contour line located at elevation five hundred and forty-five (545) feet above sea level around the Lake Tapps reservoir* of Puget Sound Power & Light Company, expressly including within the foregoing description all those portions of the islands within Lake

Tapps which lie above the 545-foot contour line and also those parcels or pockets of lowland, if any, within said perimeter which are separated from the waters of Lake Tapps by intervening shorelands above the 545-foot contour line,

EXCEPTING THEREFROM, however, the East half (E ½) of the Northwest Quarter (NW ¼) of Section Ten (10), Township Twenty (20) North, Range Five (5) East, W.M.;

TOGETHER with the following rights, which shall not belong to the Grantee exclusively, in and to the use of the waters and the bed of Lake Tapps and the land between the 545-foot contour line and the shore of the lake, so far as Grantor may lawfully grant such rights, viz.:

(a) the right to use the waters of Lake Tapps for boating, swimming, fishing and any other usual or ordinary recreational purpose, but for no other purpose whatsoever;

(b) the right to moor floats upon the lake, drive stakes into the bed of the lake for mooring floats, boats and boat houses, and to build docks down to and into the lake waters, such docks, however, to be built only upon piling;

. . .

. . . provided, further, that the rights expressed in paragraph (a) shall be exercised by the Grantee in common with the employees of Puget and other persons who, with Puget's consent, may have occasion to enjoy the privileges of Puget's summer camp and picnic grounds located in the west half of the east half of the northwest quarter of said Section 10.

Puget reserves the fee title to the bed of Lake Tapps and all land surrounding the shore of the lake and on the islands therein from the water line up to the 545-foot contour line . . .

. . .

All of the rights in favor of either party hereby created or reserved and all of the covenants, obligations and restrictions set forth herein shall run with the land and with each and every part or parcel thereof and be binding upon all successors in interest of the Grantee; . . .

The elevation 545 feet above sea level shall be determined by reference to the bronze plaque embedded in the concrete floor of the gate house at the entrance to the tunnel leading from the westerly shore of the intake

pond located in the Northwest Quarter (NW ¼) of Section Eight (8), Township Twenty (20) North, Range Five (5) East, W.M. to the White River generating plant, which bronze plaque has engraved upon it the figures "544.75" and for the purpose of this deed it is understood that said plaque is placed at the elevation of 544.75 feet above sea level.

(Italics ours.)

In December 1954 the Company filed a plat of Lake Tapps Tacoma Point, subdividing its property into blocks and lots with access roads and other amenities, including an area dedicated to public park and lake access purposes. Dike Road is among the public roads dedicated in the plat and runs generally east and west across the north end of the inlet so as to form the north boundary of lot 1 block 4 and lot 42 block 2; it serves to connect other roads in the plat and as a dike restraining the waters of the inlet in question. The plat was based upon a survey made by Ruskin Fisher and Associates, Inc., in 1954, and the description appearing on the dedicatory portion of the plat in part meanders along the 545-foot contour line above sea level "as designated in that certain deed dated June 22, 1954." Each page of the plat states that the location of the 545-foot elevation is controlled by the bronze plaque mentioned in the 1954 deed. The plat also depicts the actual shoreline of the lake as of August 1, 1954, the survey line of the subdivision and the "contour line location at elevation 545-feet above sea level." The area between the contour line and the shoreline is labeled "easement area."

Defendants Birge acquired lot 42 block 2, Lake Tapps Tacoma Point in May of 1961 and by quitclaim deed dated February 25, 1969, the Company conveyed to defendants Birge the following described tract:

All those lands, *if any,* lying between the southerly right-of-way margin of Dike Road and the contour line *545.00 feet above sea level as designated in that certain deed dated June 22, 1954* recorded in the office of the County Auditor of Pierce County in volume 1063 of Deeds at pages 485 to 495; *as shown in the Plat of Lake*

*Tapps Tacoma Point on sheets 3 and 5 of 8 sheets as recorded in volume 17 of plats, page 1 records of Pierce County, Washington*; said lands bounded on the east by the west line of Lot 42, Block 2 in said plat and terminating at the intersection of the south line of said Lot 42 and the 545.00 foot contour line; and bounded on the west by the following described line; beginning at the intersection of the 545.00 foot contour line and the south line of Lot 1, Block 4 in said plat; thence northerly along said 545.00 foot contour line and the northerly extension

thereof to the southerly margin of Dike Road and terminus of said line.

(Italics ours.)

In the lawsuit giving rise to this appeal, the parties stipulated to the admission into evidence of all exhibits which had been admitted in the prior lawsuit, including the eight sheets of the official plat of Lake Tapps Tacoma Point and exhibit 5, a photocopy of a portion of the plat depicting the inlet and the location of lot 1 on the west, lot 42 on the east and Dike Road on the north side of the inlet. This exhibit had been marked by a witness in the former suit to show the location of the 545-foot contour line; we have reproduced it here as an aid to the reader.

Based upon the evidence adduced at the first trial, including the testimony of one Edward L. Morgan, an employee of Ruskin Fisher, the court entered findings of fact among which were the following:

### III

Defendants own in fee the following described property situated in Pierce County, Washington. [The description follows exactly that of the quitclaim deed of February 25, 1969, above set forth.]

### IV

Plaintiffs owned a dock which was situated in part on defendants' real property, previously described and in part on the bed of Lake Tapps, owned in fee by Puget.

### VII

Plaintiffs have committed numerous acts of trespass on defendants' real property described in paragraph III.

The plaintiffs were permanently enjoined from going upon the real property described in finding of fact No. 3.

### RES JUDICATA—COLLATERAL ESTOPPEL

Plaintiffs assign error to the trial court's finding that the issues of the existence and ownership of the strip of land in question were litigated in the prior action between the parties and that the judgment in that cause is therefore res judicata, citing *Symington v. Hudson,* 40 Wn.2d 331, 243 P.2d 484 (1952), and *Meder v. CCME Corp.,* 7 Wn. App.

801, 502 P.2d 1252 (1972). Despite the unfortunate use of the words "if any" in the legal description contained in defendants' quitclaim deed, it is clear to us that the judge in the first proceeding did determine that the strip of land in question existed and that it was owned by defendants. This conclusion is inescapable when the findings of fact and conclusions of law entered in that suit are read together. Those findings are amply supported by the language in the deed to Birges which refers to the 545-foot contour line "as designated in that certain deed dated June 22, 1954 . . .; as shown in the Plat of Lake Tapps TACOMA POINT on sheets 3 and 5 . . ." The plat shows that the 545-foot contour line as of August 1, 1954, and sheets 3 and 5 portray the inlet with the 545-foot line lying south of Dike Road, thus forming a narrow strip of land between the contour line and the road right-of-way. In addition, exhibit 5 clearly shows such a strip. Birges' entire defense and counterclaim in the first lawsuit were based upon a claim that such land did exist and that they owned it.

Although the "causes of action" in the two lawsuits may differ in some respects, as did the prayers for relief, the pivotal issues in both lawsuits were the existence and ownership of the strip in question. Having actually and necessarily litigated those issues, the plaintiffs are now collaterally estopped from retrying those issues and the trial judge was correct in so holding, although the term "res judicata" was erroneously used. *Henderson v. Bardahl Int'l Corp.,* 72 Wn.2d 109, 431 P.2d 961 (1967). In distinguishing between the two doctrines, the Supreme Court said in *King v. Seattle,* 84 Wn.2d 239, 525 P.2d 228 (1974), at 243:

> The doctrine of collateral estoppel differs from res judicata in that, instead of preventing a second assertion of the same claim or cause of action, collateral estoppel prevents a second litigation of issues between the same parties even in connection with a different claim or cause of action.

Both doctrines serve a salutary purpose in preventing a multiplicity of suits and harassment in the courts by put-

ting an end to disputes between parties. *Bordeaux v. Ingersoll Rand Co.*, 71 Wn.2d 392, 429 P.2d 207 (1967).

### EXISTENCE OF STRIP SUPPORTED BY SUBSTANTIAL EVIDENCE

■ During the trial from which this appeal is taken, the parties presented conflicting expert testimony as to what was intended by reference in the 1954 deed to the 545-foot above sea level contour line. Portions of that testimony, if believed, would amply support a finding that the 545-foot contour line was intended to be fixed as it stood in 1954 and not shift or change from time to time as erosion or other earth changes cause a shift in the actual location of that *point above sea level on the ground.* Additionally, the documentary evidence from the first lawsuit was before the judge in the second proceeding and provided substantial evidence that such a strip existed between the 545-foot contour line as located in 1954 and Dike Road. Findings of the trial court which are based upon substantial evidence will not be disturbed on appeal. *Hudson House, Inc. v. Rozman*, 82 Wn.2d 178, 509 P.2d 992 (1973).

### NO RIPARIAN RIGHTS

■ Plaintiffs claim that, as "riparian owners," they have a right of access to the inlet of Lake Tapps over Dike Road in order to enjoy the use of the waters in common with other riparian owners.[1] Plaintiffs are not riparian owners, however, because their property is not contiguous with the lake; rather, their tract is separated from the lake by both Dike Road and the disputed strip of land. *Cf. Botton v. State*, 69 Wn.2d 751, 420 P.2d 352 (1966). Further, "riparian rights" refer to ownerships abutting on public natural bodies of water. Lake Tapps is an artificially created private reservoir, and as such there are no riparian or, as they are sometimes called, "natural rights" to its use. Any rights plaintiffs may have to use the bed and waters of Lake Tapps must derive from the 1954 deed.

---

[1]Technically speaking, riparian owners are those whose lands abut upon a river or stream, whereas those whose lands abut upon a lake or pond are termed littoral owners. *Botton v. State*, 69 Wn.2d 751, 420 P.2d 352 (1966). The reported cases use the terms interchangeably, however. *Rose v. Riedinger*, 13 Wn. App. 222, 534 P.2d 146 (1975).

DEED CREATED EASEMENTS APPURTENANT

The 1954 deed expressly provides that the rights created and reserved "shall run with the land and with each and every part or parcel thereof and be binding upon all successors in interest of the Grantee;". We agree with plaintiffs that this language gave rise to dominant easements appurtenant to the land conveyed to the Company, *i.e.*, rights to the use and enjoyment of the bed and waters of the lake in the manner and to the extent set forth in the deed. Unless these rights were somehow limited in their creation or later extinguished or diminished, they would run or go along with successive transfers of the tract benefited. Restatement of Property § 487 (1944).

EFFECT OF TAX SALE

■ During trial it was developed that plaintiffs' tract had once been sold by Pierce County for unpaid taxes. The trial court held that such a sale cut off any easement rights attaching to plaintiffs' tract since they were not the subject of the foreclosure and consequently not included in the tax deed to plaintiffs' predecessor in interest. As a general rule the sale of land for nonpayment of taxes creates a new title, free and clear of all encumbrances including easements appurtenant. *Brown v. Olmsted*, 49 Wn.2d 210, 299 P.2d 564 (1956). In 1959, however, the legislature enacted RCW 84.64.460, providing as follows:

> The general property tax assessed on any tract, lot, or parcel of real property *includes all easements appurtenant thereto*, provided said easements are a matter of public record in the auditor's office of the county in which said real property is situated. Any foreclosure of delinquent taxes on any tract, lot or parcel of real property subject to such easement or easements, and any tax deed issued pursuant thereto shall be *subject to such easement or easements*, provided such easement or easements were established of record prior to the year for which the tax was foreclosed.

(Italics ours.)

Defendants argue that this statute applies only to the foreclosure and sale of a servient estate because of the

language "shall be subject to such easement." This statute has never been before the appellate courts of Washington, but is the subject of a well-reasoned article by Professor Harry Cross in 34 Wash. L. Rev. 332 (1959). We agree with the rationale of that article and interpret the statute to mean that a tax deed passes title *subject to* servient easements appurtenant and *together with* dominant easements appurtenant to the estate sold. *Accord,* Restatement of Property § 509(2)(e)(1944). This appears to be the clear intent of the legislature because the tax assessed on the lands includes "all easements appurtenant thereto" if the easements are a matter of public record. The trial court's error in holding that the tax deed destroyed any easement rights to the lake does not require reversal, however, as will be seen.

### Subdivision Of Dominant Estate

■ Easements appurtenant become a part of the realty which they benefit. Unless limited by the terms of their creation or transfer, they follow possession of the dominant estate through successive transfers. Restatement of Property § 487 (1944). The rule applies even when the dominant estate is subdivided into parcels, with each parcel continuing to enjoy the use of the servient tenement. Restatement of Property § 488 (1944); 3 H. Tiffany, *The Law of Real Property* § 761 (3d ed. 1939); 2 G. Thompson, *Real Property* § 432 (1961 reprint). However, as stated in section 487 of the Restatement at page 3030:

> There is nothing to prevent a transferor from effectively providing that the benefit of an easement appurtenant shall not pass to the transferee of the dominant tenement. Such a provision contravenes no rule of law. If its purpose is to extinguish the easement it will have this effect.

By the same token, the possessor of the whole of the dominant estate may so deal with it that easement benefits are extinguished or diminished prior to its being transferred.

■ In the instant case the Company, as possessor of

the entire dominant estate, acted to extinguish or diminish the easement benefits attaching to certain portions of its lands when it subdivided by plat. In the plat of Tacoma Point, the Company created both waterfront lots and interior tracts. The latter are completely separated from the lake by the network of roads and intervening lakefront lots. Clearly the intent of the plattor was that only those tracts bordering on the lake should have rights of *direct access* to the bed and waters of the lake. Just as clearly, the plattors intended that the interior tracts have only limited access for recreational purposes at the public facilities either originally reserved by Puget or dedicated in the plat. It is inconceivable that the Company intended that the interior tracts should have untrammeled access to the lake over lakefront ownerships.

For the reasons stated we hold that plaintiffs' tract carries with it no rights of access to Lake Tapps over the private property fronting on the lake.

### No Access Over Dike Road

Plaintiffs lastly contend that the trial court erred when it found that Dike Road was dedicated to the public for use as a roadway and not for use as an access to the lake. The trial court relied on *Albee v. Yarrow Point*, 74 Wn.2d 453, 445 P.2d 340 (1968). In that case the court held the "plattors," the owners of the upland and the second class shorelands, "intended to extend a dedicated road across the second class shorelands to navigable waters so as to provide access to the lake for upland owners." The court based its finding on the fact that *the plattors had provided no other access to the lake for these lots* and a considerable part of the value of such lots was attributable to such access rights. The court went on to say that if this was not the actual intent of the plattors the law would presume it was, quoting from an Attorney General's opinion at page 457, as follows:

Thus, dedication to the use of the public of a street extending to the shore of a lake will be presumed to

have been intended to enable the public to have access to the water for all proper public purposes.

The court further stated at page 458:

Land dedicated as a street is thereby devoted to a general or public use, held in trust for the public and for the convenience of public travel. In addition to this primary purpose, there are other permissible secondary uses which, however, must be consistent with the primary street purpose.

Plaintiffs seize upon the last quoted language as the basis for their argument that the use of Dike Road as a means of gaining access to the lake is consistent with the purpose for which that road was dedicated. Unlike the road in the *Albee* case, however, Dike Road was initially constructed on a dike whose purpose was to help contain the waters of Lake Tapps when formed. The road as platted, does not travel *to the lake* but serves merely as a connector road within that plat. It would be a tortured construction to say it was the intention of the plattors that interior owners or the public could utilize Dike Road in order to cross over private lands to gain access to the lake. This is not a consistent secondary use of such a road.

Lastly, we find no error in the trial court's denial of damages for mental or emotional harm. There is some evidence of harassment such as verbal insults and spraying with a water hose, but no evidence of such damage.

Judgment affirmed.

PETRIE, C.J., and PEARSON, J., concur.